UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                         No. 1:17-cr-0127

       v.                               Hon. Paul L. Maloney
                                                United States District Judge

MARK E. BREWSTER, M.D.,

        Defendant.
_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

Starting in 2006 and continuing into December 2015, when he was alerted to this federal investigation, Mark E. Brewster, M.D., wrote over 150 fraudulent prescriptions in the names of seven different people—including three romantic partners and two children—to obtain quantities of Ritalin, a Schedule II controlled substance, for his personal use. By the end of 2015, Dr. Brewster was using 450 pills a month: five times the maximum FDA-approved adult dosage for Ritalin.

Dr. Brewster wrote fraudulent prescriptions while on probation following a domestic violence conviction. He wrote fraudulent prescriptions after a hospital fired him for his prescribing practices. Even a state licensing investigation did not deter Dr. Brewster, who further concealed his fraud by using the names of children and recruiting new people into his scheme. When the DEA arrived on his doorstep, Dr. Brewster told his accomplices not to talk and dismissed federal investigators as "laughable" and "[l]osers."

Dr. Brewster has since insisted that the false prescriptions were a mistake of convenience; a way for him to continue valid prescription drug therapy. Ten days after pleading guilty, Dr. Brewster characterized his conduct as merely getting "medication that I've been on for 33 years

through misrepresentation" and claimed that "[e]ven the federal government, there's never been a – a question of classic drug abuse[.]" Transcript Excerpts, *Brewster v. Brewster*, No. 2015-11792-DM (Aug. 9, 2017) at 13:7–10, 15:2–3, attached hereto as **Exhibit A**.

To the contrary, this case is about abuse: Dr. Brewster's abuse of a highly addictive Schedule II stimulant; his abuse of the trust invested in him by his profession; his abuse of the health care system; and his abuse of friendships and intimacy. For these reasons, and for the reasons discussed more fully below, this Court should find that Dr. Brewster's escalating pattern of abuse, as well as his disregard for the law and any oversight of his conduct, warrants a serious sentence within the range set forth in the Sentencing Guidelines.

## II.     BACKGROUND

Dr. Brewster started writing fraudulent prescriptions in 2006, before he graduated from medical school. Presentence Investigation Report ("PSR") ¶ 16. By 2012, Dr. Brewster was concurrently writing fraudulent prescriptions in the names of three different women: Dailan Swann, his wife's maiden name; Karoline Mallinger, R.N., a one-time romantic partner; and Nicole Aiello, R.N., who was involved in a secret long-term affair with Dr. Brewster. *Id.* ¶¶ 16, 30, 31. Dr. Brewster directed all three women to fill false Ritalin and/or Ambien prescriptions and return the drugs to him. *Id.* These prescriptions were in addition to the high dosages of Ritalin that he received, monthly, from his treating physician in Southfield, Michigan. *Id.* ¶ 14.

In March 2015, Dr. Brewster's affair and his false prescriptions to Ms. Aiello were exposed when his wife found pill bottles in Ms. Aiello's name in Dr. Brewster's bag. *Id.* ¶ 20. This discovery, along with Dr. Brewster's related spousal assault charge, resulted in a series of consequences in 2015, any one of which should have put an end to Dr. Brewster's illegal prescribing practices. These consequences included:

- <u>March 2015</u>.  Dr. Brewster pled guilty to domestic violence after his wife confronted him about his affair.  *Id.* ¶ 55.  Months later, Dr. Brewster lost his deferred conviction after repeated, alcohol-related probation violations.  *Id.*; *see also infra* Part II.B.

- <u>March and April 2015</u>.  Dr. Brewster was fired from two health care providers, including McLaren Northern Michigan ("McLaren"), which fired him for "prescribing controlled substances to an individual with whom you have no patient-physician relationship" (*i.e.*, Ms. Aiello) and informed him that "[t]he Detroit Medical Center will be filing a report with LARA" (the Michigan Bureau of Licensing and Regulatory Affairs).  McLaren Termination Letter, attached hereto as **Exhibit B**.  PSR ¶¶ 96–97.

- <u>August 4 and 6, 2015</u>.  A LARA investigator interviewed Dr. Brewster and Ms. Aiello.  Dr. Brewster admitted prescribing drugs to Ms. Aiello, who was not his patient.  He and Ms. Aiello both lied to the LARA investigator, however, stating that Dr. Brewster did not receive any of the drugs that he prescribed to Ms. Aiello.  Dr. Brewster also assured the LARA investigator that, going forward, there was "zero chance he [would] write another prescription for anyone other than his patients."  PSR ¶¶ 17, 24.

None of these personal or professional consequences deterred Dr. Brewster.  Rather, Dr. Brewster continued writing fraudulent prescriptions and became even more calculated in concealing his conduct.  For example, when McLaren advised Dr. Brewster that his prescriptions to Ms. Aiello would be the subject of a licensing investigation, Dr. Brewster stopped writing to Ms. Aiello and began writing monthly fraudulent prescriptions in the names of her two children, R.W. and K.W.  PSR ¶ 31.  R.W. and K.W. bore their father's last name and could not be tied to Ms. Aiello or Dr. Brewster through a review of prescription drug reports.  Dr. Brewster also falsified ADHD diagnoses on those prescriptions to avoid scrutiny.  *See* R.W. Prescription, **Exhibit C** (written on a prescription pad from Northern Michigan Gastroenterology, months after that practice fired Dr. Brewster).  Neither of Ms. Aiello's children has ADHD nor did they receive any of these drugs.  Ms. Aiello filled the prescriptions and returned the drugs to Dr. Brewster.

In addition to writing false prescriptions in the names of Ms. Aiello's children, Dr. Brewster recruited two other people to help him obtain even more Ritalin and Ambien.  On July

7, 2015—one week after writing a fraudulent prescription to K.W.—and continuing through November 2015, Dr. Brewster recruited his hair stylist, Matthew Stephan, into the scheme. PSR ¶ 31. Like R.W. and K.W., whose identities Dr. Brewster continued to use, Mr. Stephan was unknown to LARA investigators and also had insurance that covered the false prescriptions. Dr. Brewster often bragged about how he was "[s]ticking it to the man" by having Mr. Stephan's insurance (Blue Cross Blue Shield of Michigan) pay for his fraudulent prescriptions:[1]



Excerpts From Brewster-Stephan Text Messages (Phone 1), attached hereto as **Exhibit D**, at 7, Excerpts From Brewster-Stephan Text Messages (Phone 2), attached hereto as **Exhibit E**, at 9.

On August 5, 2015—one day after assuring the LARA investigator that there was "zero chance he [would] write another prescription for anyone other than his patients"—Dr. Brewster contacted Mr. Stephan and asked, "You feel like getting me my Rx this last time?!?" Exhibit D at 12. Dr. Brewster claimed that he had "been out for 2 days," neglecting to inform Mr. Stephan that

---

[1] Dr. Brewster's text messages are on the left-hand side, in gray. Mr. Stephan's text messages are on the right-hand side, in blue. Mr. Stephan will be available at sentencing to testify about a variety of matters and will provide the necessary foundation for these text messages if there is any dispute about their authenticity. In the enclosed exhibits, the government has redacted unrelated communications, a variety of images, and references to Mr. Stephan's medical history and other personal information.

4

he recently obtained 150 Ritalin pills through false prescriptions in the names of R.W. and K.W. *Id.* Mr. Stephan filled the prescription for 90 more pills and expressed concerns that he was "being set up" because pharmacy employees "acted all weird." PSR ¶ 25; Exhibit D at 15. Dr. Brewster promised to "put an addendum on your note that we discussed it" and later falsified a progress note in Mr. Stephan's medical record to conceal the fraudulent prescriptions. PSR ¶ 25. The next day, August 6, 2015, Dr. Brewster received a prescription for 162 Ritalin pills from his treating physician in Southfield, his fourth Ritalin prescription in 20 days.

In addition to writing fraudulent prescriptions, Dr. Brewster also recruited two of his practitioner colleagues at Kalkaska Memorial Health Center as additional sources of illegal Ritalin. *Id.* ¶¶ 35–37. Dr. Brewster did not tell his colleagues about each other, nor did he disclose that he was using R.W., K.W., and Mr. Stephan to obtain additional Ritalin. *Id.* As a result, Dr. Brewster was able to obtain 420 Ritalin pills from four different sources in a single month, October 2015. *Id.* ¶ 34. In November 2015, the month before Dr. Brewster learned about the DEA investigation, he obtained 450 Ritalin pills, an amount that represented five times the maximum FDA-approved Ritalin dosage for adults. *Id.*[2] There is no clinical justification for these quantities of Ritalin. *See* Report of Edward Jouney, D.O., attached hereto as **Exhibit F**. The government's consulting physicians have uniformly expressed disbelief that one person could consume this much Ritalin. *Id.* at 2 ("This type of prescribing is essentially unheard of in traditional psychiatric practice.").

Dr. Brewster stopped writing prescriptions in Mr. Stephan's name after November 2015 because he believed that Mr. Stephan was changing insurers. *See* Exhibit E at 6 ("This literally

---

[2] *See* U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs., Stimulant and Related Medications: U.S. Food and Drug Administration-Approved Indications for Use in Adults, *available at* https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Pharmacy-Education-Materials/Downloads/stim-adult-dosingchart11-14.pdf (stating that the maximum adult dose for methylphenidate is 60mg per day). Dr. Brewster received the equivalent of 300mg per day by November 2015 (450 20mg pills).

will have to be the last time cuz my insurance is gonna suck with the change."). Dr. Brewster then turned to another person, Jeremy Whittaker, to fill a fraudulent prescription on December 11, 2015. PSR ¶ 31. Dr. Brewster only stopped writing false prescriptions when the DEA investigation became overt following their December 21, 2015 interview of Ms. Aiello. *Id.* ¶ 32.

The same day that the DEA interviewed Ms. Aiello, Dr. Brewster contacted Mr. Stephan and recommended that, if approached, Mr. Stephan not talk to anyone about anything. PSR ¶ 39; Exhibit E at 13. Dr. Brewster later instructed Ms. Mallinger, his earliest source of illegal Ambien, not to tell the DEA anything about the prescriptions between them. PSR ¶ 40. After his own interview with the DEA on December 24, 2015, Dr. Brewster again contacted Mr. Stephan and assured him that they had nothing to worry about. Federal investigators were "laughable," Dr. Brewster said. "Losers following up on the worst lead on the planet in northern fucking Michigan. . . . I make fun of them basically." Exhibit E at 16.

On February 10, 2016, the DEA executed a search warrant at Dr. Brewster's home. Agents seized boxes of blank prescription pads from Kalkaska Memorial Health Center, Northern Michigan Gastroenterology, and Detroit Receiving Hospital. Agents also seized two phones belonging to Dr. Brewster and a document entitled, "Time Drugs May Be Detected In Urine After Last Use," attached hereto as **Exhibit G**. Local officers assisting with the search seized a Sig Sauer .380 from Dr. Brewster's master bedroom closet, along with 200 rounds of ammunition. Dr. Brewster was arrested for his third probation violation (possessing a prohibited firearm) and subsequently served twelve days in jail. PSR ¶ 55.

II.  **ARGUMENT**

In the last six months, a rash of health care professionals were charged, pled guilty, or were sentenced for writing fraudulent prescriptions to obtain prescription ADHD drugs:

6

- In October 2017, a 40-year-old Arizona physician was indicted for obtaining Adderall by forging prescriptions from out-of-state doctors.[3]

- In August 2017, a 42-year old Michigan physician diagnosed with ADHD was sentenced to six months' imprisonment for obtaining Adderall by writing false prescriptions to an accomplice.[4]

- In May 2017, a 53-year-old Wisconsin physician was sentenced in federal court to sixteen months' imprisonment for supplying herself with Adderall by writing prescriptions in other doctors' names. *United States v. Knowles*, No. 1:16-cr-084 (W.D. Wis. May 9, 2017).[5]

- In May 2017, a 46-year-old California gastroenterologist was charged with fraudulently obtaining Ritalin over a three-year period by writing prescriptions under three different aliases.[6]

- In May 2017, a 35-year-old Mississippi nurse practitioner was indicted for obtaining Adderall by writing prescriptions in the names of family members. A 49-year-old physician also surrendered his DEA registration for writing Adderall prescriptions to himself, family members, and friends.[7]

These cases demonstrate what federal investigators know to be true. First, methylphenidate (Ritalin), as a Schedule II controlled substance, carries a "high potential for abuse which may lead

---

[3] Angela Gonzales, *Arizona Physician Indicted For Forging Adderall Prescriptions*, Phoenix Business Journal, Oct. 12, 2017, *at* http://www.bizjournals.com/phoenix/news/2017/10/12/arizona-physician-indicted-for-forging-adderall.html (last visited Oct. 24, 2017).

[4] Don Reid, *Whitaker Pleads Guilty In Drug Case*, The Daily Reporter, July 11, 2017, *at* http://www.thedailyreporter.com/news/20170711/whitaker-pleads-in-drug-case (last visited Oct. 24, 2017); Ken Delaney, *Coldwater Doctor Gets 6 Months For Drug Fraud*, WTVB, Aug. 15, 2017, *at* http://wtvbam.com/news/articles/2017/aug/15/coldwater-doctor-gets-6-months-on-drug-fraud-charges/ (last visited Oct. 25, 2017).

[5] Kevin Murphy, *Former Stevens Point Psychiatrist Sent To Prison*, USA Today, May 9, 2017, *at* https://www.usatoday.com/story/news/2017/05/09/former-stevens-point-psychiatrist-sent-prison/101474558/ (last visited Oct. 24, 2017).

[6] Bay City News, *Former UCSF Doctor Charged With Writing Fake Ritalin Prescriptions*, May 25, 2017, *at* http://kron4.com/2017/05/25/former-ucsf-doctor-charged-with-writing-fake-ritalin-prescriptions/ (last visited Oct. 24, 2017).

[7] Therese Apel, *Miss. Drug Probe Nets Doctors, Nurse Practitioners*, USA Today, May 18, 2017, at http://www.usatoday.com/story/news/nation-now/2017/05/18/miss-drug-probe-nets-doctors-nurse-practitioners/329362001 (last visited Oct. 24, 2017).

to severe psychological or physical dependence." DEA, Controlled Substance Schedules, *at* https://www.deadiversion.usdoj.gov/schedules/ (last visited Oct. 24, 2017). Second, stimulant abuse is on the rise, particularly amongst ostensibly legitimate users and those over age 26. DEA, 2017 National Drug Threat Assessment, at 31–32, *available at* https://www.dea.gov/docs/DIR-040-17_2017-NDTA.pdf (last visited Oct. 24, 2017). Third, health care professionals—and Dr. Brewster, in particular—have not gotten the message that prescription drug frauds are serious offenses.

> A. **The Court Should Apply A Four-Level Role Enhancement Under U.S.S.G. § 3B1.1(a).**

The government objects to the PSR for its failure to score a four-level role enhancement under U.S.S.G. § 3B1.1(a). Application of this enhancement would result in a Guidelines range of 12 to 18 months' imprisonment. In declining to score the role enhancement, the Addendum to the PSR (the "Addendum") omits any reference to *United States v. Sipsy*, 287 F. App'x 270 (4th Cir. 2008), which the government identified as supporting a role enhancement in a case involving a physician who wrote fraudulent prescriptions to feed his controlled substance addiction. As the *Sipsy* court explained:

> [The defendant physician] . . . exercised decision making authority over the other three in that only [the defendant] . . . had the power to write prescriptions. Moreover, as [the defendant] had the ability to prescribe the medication, he could control which of his three accomplices to use, when the hydrocodone would be prescribed, and in what quantity and strength.

*Id.* at 272 (rejecting the argument that applying both role and abuse-of-trust enhancements results in improper double-counting). In *Knowles*—over the parties' stipulation not to score a role enhancement—the district court stated as follows regarding a physician who wrote fraudulent prescriptions to feed her abuse of prescription ADHD drugs:

> I do find that the adjustment for the role in the offense is appropriate. I understand the government's argument [regarding its obligations under the plea agreement],

8

> but I think that there is a fair case to be made that although the individual participants didn't necessarily conspire with each other, [the defendant physician] was involved in the hub of a wheel with spokes out to the other participants.

Transcript of Sentencing Hearing at 6, *United States v. Knowles*, No. 1:16-cr-084 (May 9, 2017).

The Addendum does not discuss *Sipsy*, but instead cites cases that do not correlate, in any way, to this case or the record evidence establishing Dr. Brewster's leadership role. *See United States v. Sostre*, 967 F.2d 728, 733 (5th Cir. 1992) (involving a middleman who only "[brought] together the potential buyers and the sellers" of cocaine); *see also United States v. Woods*, 335 F.3d 993 (9th Cir. 2003) (involving a defendant who had little interaction with other participants); *United States v. Parmalee*, 42 F.3d 387, 395 (7th Cir. 1994) ("[W]e cannot find any evidence that shows [the pilot in a smuggling ring] controlled or coordinated any of his co-defendants' activities."); *United States v. Sherrod*, 964 F.2d 1501 (11th Cir. 1992) (involving a methamphetamine chemist who did not direct or control any aspect of the conspiracy).

The Addendum further omits references to nearly all of the relevant criteria identified in the Application Notes to § 3B1.1. The stated basis for denying the role enhancement—that "the evidence does not reflect Dr. Brewster exercised any control over the individuals"—is refuted by the recitation of the offense conduct in the PSR and the evidence developed in this case. PSR Addendum at 1. The notion that Dr. Brewster "was not in a position of power or influence over the participants' lives, work, or income," *id.* at 1, is not one of the relevant criteria—and certainly not a dispositive criterion—for this enhancement. Dr. Brewster directed the other participants' conduct and criminal activity in a manner that meets every one of the leadership criteria set forth in the Application Notes to § 3B1.1.

1.  **Dr. Brewster Directed And Controlled The Other Participants In His Fraudulent Prescription Scheme.**

In the course of writing his fraudulent prescriptions, Dr. Brewster exercised near-exclusive decision making and planning authority. *See* U.S.S.G. § 3B1.1 (cmt. n. 4). First, Dr. Brewster recruited each accomplice into the scheme. *See* PSR ¶ 29, 31, 32. Second, of all the participants, only Dr. Brewster had the power to write prescriptions for controlled substances. Third, Dr. Brewster controlled when Ritalin and Ambien would be prescribed, in what quantities and strengths, in whose names, and which accomplices would fill the prescriptions. *See Sipsy*, 287 F. App'x at 272. In some cases, Dr. Brewster directed participants to use pharmacies that were unlikely to question his prescriptions. *See* Exhibit D at 10 ("I'd just go to Rite Aid by hospital. I send million scripts there all time!" [sic]). He also told participants what to do if they had any problems filling the prescriptions or if they were contacted by law enforcement. *Id.* ("If anyone says anything at the pharmacy just tell them to call ER, and ask to speak w me!"); PSR ¶¶ 39–40.

Dr. Brewster also selected, controlled, and coordinated information amongst his various accomplices. He isolated information from them, and from his treating physician, to control the scope of their knowledge and ensure that none of the participants learned about each other or the total quantities of drugs that he received. It was only because of Dr. Brewster that these individuals became involved in this case and subject to criminal charges and civil penalties. PSR ¶ 31. Dr. Brewster thus satisfies every § 3B1.1 consideration pertaining to a leader of criminal activity.

2.  **Dr. Brewster's Criminal Activity Involved Six Participants Or Was "Otherwise Extensive."**

In the Sixth Circuit, participants in criminal activity include those "who were (i) aware of the criminal objective; and (ii) knowingly offered their assistance." *United States v. Anthony*, 280 F.3d 694, 698 (6th Cir. 2002). Dr. Brewster was the leader of criminal activity that involved six participants: himself, Ms. Mallinger, Ms. Brewster, Ms. Aiello, Mr. Stephan, and Mr. Whittaker.

*See United States v. Carroll*, 87 F.3d 1315, at *5 (6th Cir. 1996) (unpublished) ("[E]very circuit which has considered this question has concluded that the defendant counts as a participant within the meaning of § 3B1.1."). Each participant committed a criminal act—an act that Dr. Brewster planned, organized, and controlled—when he or she knowingly presented a false prescription to obtain controlled substances.

Each of Dr. Brewster's accomplices knew that their conduct was wrong. Ms. Aiello pled guilty to aiding and abetting Dr. Brewster's false prescription scheme because she knew it was wrong. *United States v. Aiello*, No. 1:17-cr-00184-PLM (W.D. Mich.). Like Ms. Aiello, Ms. Mallinger is a licensed nurse and was well aware that it was unlawful fill false prescriptions. Ms. Brewster specifically asked Dr. Brewster to stop writing fraudulent prescriptions because she was concerned about being tied to the scheme through records of false prescriptions in her maiden name. PSR ¶ 30. Mr. Stephan—who stated that he was "not above scamming the system," Exhibit D at 7—expressed concerns about filling the fraudulent prescriptions. *See id.* at 9 ("Can we get in trouble for doing this? Feeling nervous about it."); *id.* at 15 ("I feel like I'm being set up or something . . . ."); Exhibit E at 5 ("If we both end up in the same prison, I'm telling bubba you like it . . . ."). On one occasion, Dr. Brewster responded to Mr. Stephan's concerns as follows:



Exhibit D at 18. Ms. Mallinger and Mr. Stephan will be available to testify at sentencing if there is any doubt about whether the participants understood that their conduct was wrong.

Finally, the four-level role enhancement also applies in this case because Dr. Brewster's criminal activity was "otherwise extensive" under § 3B1.1(a). *See Anthony*, 280 F.3d at 698–701

11

(holding that activity is "otherwise extensive" if the contributions of participants and non-participants "is the functional equivalent of an activity involving five criminally responsible participants"). For the reasons discussed more fully above, each of these individuals' contributions were "so essential to the criminal objective that [they] should be counted as . . . participant[s] irrespective of [their] true criminal intent." *Id.* at 701.

> B. **Dr. Brewster Has A Substance Abuse Problem, A Disregard For The Law, And Disdain For Any Oversight Of His Conduct.**

In the PSR, and in his sentencing memoranda, Dr. Brewster claims that he obtained dangerous quantities of illegal Ritalin "to keep [him] focused regarding [his] practice," to "better focus on [his] work," and "to help [him] perform better as a physician." PSR ¶ 41. Dr. Brewster's uncontrollable behavior and the quantities of pills involved—which exceeded 400% of the maximum adult daily dosage of Ritalin—contradict his explanation. *See* Exhibit F. The *Knowles* court described a similar argument as

> not at all an adequate explanation for this kind of conduct. There comes a point when a professional just has to say, "No. I can't produce at this level without using drugs. I can't produce at this level and still serve my patients." That is a professional responsibility to deal with that kind of pressure. I also didn't see any real corroboration of that fact in the presentence report and so I think that is a deflection.

*Knowles* Transcript, *supra*, at 20–21.

Dr. Brewster's decade-long prescription fraud was not in service of professional success, but a serious substance abuse problem, an enduring disregard for the law, and a persistent aversion to any oversight of his conduct. Those qualities were on full display during his state court probation, which further demonstrates the acute need for specific deterrence in this case. *See United States v. Parker*, 453 F. App'x 48, 50–51 (2d Cir. 2011) (affirming that a defendant's "prior

12

noncompliance with the terms of a probation sentence demonstrated a general disregard for the law" and is relevant to the § 3553(a) analysis).

The terms of Dr. Brewster's May 2015 probation included the following: (1) do not consume or possess any non-prescribed medication; (2) do not consume or possess alcohol; (3) do not possess firearms or any other weapons; and (4) attend 36 weeks of M.E.N.S. (Men Exploring Non-Violent Solutions) courses.  Sentencing Sheet, **Exhibit H**.  Dr. Brewster, however, continued to illegally obtain considerably more Ritalin than he was prescribed.  He also obtained Ambien, a controlled substance that he was not prescribed.  Then, on May 13, 2015—six days after being placed on probation—Dr. Brewster consumed alcohol.  PSR ¶ 55.  He possessed alcohol two weeks later, consumed alcohol again on October 17, 2015, and regularly failed to test on his home alcohol unit, all of which led to two violation hearings and a revocation of the deferral for his domestic assault conviction.  *See id.*

The 86th District Court discovered the alcohol violations despite Dr. Brewster's best efforts to conceal his continued use of prohibited substances.  As noted above, law enforcement seized a document entitled, "Time Drugs May Be Detected In Urine After Last Use," during the February 2016 search of Dr. Brewster's home. *See* Exhibit G.  If called at sentencing, Matthew Stephan will testify that following the domestic violence charge, Dr. Brewster showed him an application on his phone that allowed him to calculate the time necessary for alcohol to metabolize in his system before submitting to a urine drug screen.  This conduct and Dr. Brewster's classic addictive behaviors confirm a serious substance abuse problem.  *See Brewster* Transcript, Exhibit A at 15:2–3; Jouney Report, Exhibit F.

During the February 2016 search, law enforcement also found Dr. Brewster's Sig Sauer .380, along with over 200 rounds of ammunition.  PSR ¶ 55.  Dr. Brewster admitted that the firearm

13

and the ammunition were his. If called at sentencing, Mr. Stephan will testify that Dr. Brewster brought the loaded gun from his car into Mr. Stephan's hair salon, where he bragged about how it was a "violation" because he was not supposed to have it. Dr. Brewster has such a disregard for the law that he continued to possess—and bragged about possessing—a prohibited firearm and ammunition when he knew that he was on probation and under active federal investigation.

Finally, Dr. Brewster's opinions about his court-ordered counseling reflect his general contempt for any term of supervision. Dr. Brewster referred to his M.E.N.S. domestic violence counseling using a variety of descriptors:

> Hell yes I'm still taking my beater class... Got that shit for 36 weeks! It's turning into a invited speaker roll every time I go... It's hilarious. Even the instructors just let me talk I'm getting ready to stand up and start drawing things on the drawing board!!!!

> I'm getting an A on how to beat my bitch and not get in trouble for it!!!!

> Or better yet how to beat your bitch and then convince the world that you had nothing to do with it!!!

Exhibit D at 5.

       **C.**     **The Court Should Deny Dr. Brewster's Request For A Downward Variance.**

Dr. Brewster did not provide the probation officer with any justification for a downward variance and the PSR does not identify any grounds for such a variance in this case. Dr. Brewster now claims that a variance is appropriate in light of (1) his October 2017 monitoring agreement with the Health Professional Recovery Program ("HPRP"); and (2) the collateral consequences of his conduct. *See* Memorandum in Support of Defendant's Motion for a Downward Variance

("Def. Memo"), Docket No. ("Dkt.") 25.  The aggravating factors that exacerbate the seriousness of Dr. Brewster's conduct dispense with his stated grounds for a variance and bring this case well within the heartland of cases in the Guideline range.  *See United States v. Bostic*, 371 F.3d 865, 874 (6th Cir. 2004).  The Court should accordingly deny Dr. Brewster's request.

As an initial matter, Dr. Brewster states that enrolling with HPRP was his idea after he "finally fully realized that he has a problem[.]"  Def. Memo, Dkt. 25 at 2.  Without discounting the possibility of such an epiphany, the Court should evaluate Dr. Brewster's claim, one week before sentencing, in the context of his calculated manipulations in this case and his August 2017 testimony that "there's never been a – a question of classic drug abuse" with respect to his use of controlled substances.  Exhibit A at 15:2–3.  Enrollment in HPRP, moreover, was not Dr. Brewster's idea.  It was a requirement under his May 2017 consent order with LARA to secure the terms of a negotiated resolution to his licensing case.  *See id.* at 15:1–3 ("My license was not suspended, however, I had to check in with HPRP.").

Dr. Brewster argues that a variance is appropriate because the terms of his prospective HPRP monitoring—including prohibitions on his use of alcohol and other controlled substances, random drug screens, and his participation in a twelve-step program—provide the necessary framework for him to change his conduct.  Def. Memo, Dkt. 25 at 3.  Those same terms, which Dr. Brewster tried to circumvent and intentionally violated on multiple occasions, proved utterly ineffective at changing his conduct while he was on state court probation.  *See supra* Part II.B.  Dr. Brewster repeatedly violated those terms despite the threat of serious consequences: a criminal conviction and incarceration.  Dr. Brewster has no record of compliance with the HPRP program and, based on his past conduct and comments, the Court has no reason to believe that "structure and therapy" will yield a different result this time.  Def. Memo, Dkt. 25 at 2.

15

Finally, Dr. Brewster cites a variety of collateral consequences as grounds for a variance. Most of these matters have nothing to do with this federal investigation. For instance, Dr. Brewster's financial difficulties, which predated this offense, are the result of his extravagant spending habits and the infidelity that led to his divorce; they are not a consequence of his conviction. *See* Exhibit E at 5 ("I'm broke as a joke Bc I keep buying stupid shit on Amazon[.]"); PSR ¶ 104. Dr. Brewster—who continues to work and earn a six-figure salary—also claims that he lost the "opportunity to earn a substantial income," ignoring that he was fired from two higher-paying jobs by employers who were unaware of his fraudulent prescriptions.[8] Def. Memo, Dkt. 25 at 4; PSR ¶ 94–97.

Dr. Brewster thus argues for leniency based on undefined "service-provision eligibility" concerns and the loss of certain prescriptive authorities. Def. Memo, Dkt. 25 at 4. These are consequences of his conduct, not punishment. Moreover, the dangers posed by physicians like Dr. Brewster do not derive solely from their prescription pads, but their underlying propensity to deceive and manipulate. In sentencing a similar defendant, the *Knowles* court recognized that the defendant physician, like Dr. Brewster, was "someone who took advantage of people close to her." *Knowles* Transcript, *supra*, at 22. The court "[did not] see any reason why [the physician] couldn't use that kind of character trait to the disadvantage of other people in some other context," noting "that kind of manipulative conduct could be transformed in some other way." *Id.* In imposing a Guidelines sentence that included a term of imprisonment, the court concluded:

> I can't look at a person who has extraordinary privilege by virtue of her education and her medical degree and a professional practice and say that the loss of those things necessarily means that prison is out of the question as an appropriate punishment.

---

[8] Northern Michigan Gastroenterology fired Dr. Brewster for professional reasons. PSR ¶ 97. McLaren fired Dr. Brewster for prescribing to someone who was not his patient, not because McLaren knew that those prescriptions were fraudulent and intended to secure drugs for Dr. Brewster. *Id.* ¶ 96.

16

*Id.* at 23.

Dr. Brewster asks for another break after receiving every possible chance to correct his conduct. He wasted opportunity after opportunity and now finds himself in the same situation, making the same arguments, as the health care professionals who were charged, pled guilty, or were sentenced for the same conduct in the last six months. Dr. Brewster's pattern of conduct is not at all outside the heartland of cases such that a downward variance is warranted.

### III.    CONCLUSION

The nature and circumstances of this offense are egregious and involve a decade of abuse that not only continued unabated, but dramatically escalated despite state court supervision, employment consequences, and a state licensing investigation. Dr. Brewster's history and characteristics reflect an express disdain for the law, law enforcement, regulatory authorities, and court orders. The more Dr. Brewster came under scrutiny, the more drugs he illegally obtained and abused, and the more he denounced any supervision or regulation of his conduct. The Court should therefore deny Dr. Brewster's motion for a downward variance and find that the § 3553(a) factors support a sentence within the Sentencing Guidelines range.

Dated: October 31, 2017              Respectfully submitted,

ANDREW BYERLY BIRGE
Acting United States Attorney

/s/ *Adam B. Townshend*
ADAM B. TOWNSHEND
RAYMOND E. BECKERING III
Assistant U.S. Attorneys
U.S. Attorney's Office, Western District of Michigan
330 Ionia Ave. NW, Suite 501
Grand Rapids, MI 49503
Tel: (616) 808-2130
E-mail: adam.townshend@usdoj.gov